OPINION OF THE COURT
Gary J. Weber, J.
Mt. Hope Asphalt Corporation is charged with violating ECL 71- 2713 (3) and 71-2711 (3) by knowingly engaging in conduct "which cause[d] the release to the environment” of soil and solid waste with an aggregate weight of more than 15,000 pounds containing zinc, lead, chromium, acetone, 1,3,5 trimethylbenzene, 1,2,4 trimethylbenzene, ethylbenzene and petroleum.
Both the defendants, Mt. Hope Asphalt Corporation and Frank Petrosky (hereinafter referred to as respectively Mt. Hope and Petrosky), are named in three counts of the indictment, which charge all the defendants with offering a false instrument for filing in the first degree.
background
In approximately the midpart of 1990 the defendant(s) and others conceived a plan by which certain petroleum contami *519 nated sand and soil (hereinafter referred to as PCS) could be disposed of by including them as ingredients in asphalt mix which, under any circumstances, contains a considerable amount of petroleum product.
The proposal won preliminary approval from the New York State Department of Environmental Conservation (hereinafter referred to as DEC).
The New York State DEC issued a permit with an effective date of August 7, 1991 to Mt. Hope which was transmitted to the attention of the defendant, Petrosky, by way of a letter signed by DEC Senior Environmental Analyst Karen A. Munze and dated August 9, 1991.
The practical effect of the permit was to allow the Mt. Hope facility to begin to process PCS, if only at first, on an experimental basis.
The permit contains a number of restrictions and requirements but for the purposes of the instant controversy the relevant portion of the permit language reads as follows:
RECORD KEEPING AND REPORTING
"A. Sampling results from each contaminated soil site must be retained for three years after the date of analysis. A log containing an entry for each delivery of contaminated soil to the facility must be maintained within 30 days of the end of each calendar quarter must be submitted to the NYSDEC Regional Air Pollution Control Engineer. Each log entry must include the following items:
"1. NYSDEC spill number and name of involved individual from NYSDEC oil spill response team;
"2. Location of spill site;
"3. Quantity of soil to be removed”.
It is the three contaminated soil logs marked in evidence as People’s exhibits 2, 2A and 2B filed with the DEC in order to meet the condition of the permit as above stated which are the false instruments that are the subject of counts 5, 6 and 7 as to each of these defendants.
During the course of its investigation into these and other alleged irregularities the Suffolk County District Attorney’s Office obtained a search warrant, for the purpose of physically examining the Mt. Hope Calverton facility, which was executed on September 16, 1993.
A certain amount of excavation at Mt. Hope was done in connection with the execution of the search warrant and *520 resulted, in the charge now also before the court relating to alleged violations of the ECL.
THE OFFERING OF A FALSE INSTRUMENT FOR FILING COUNTS
The relevant statute Penal Law § 175.35 provides as follows:
"Offering a false instrument for filing in the first degree.
"A person is guilty of offering a false instrument for filing in the first degree when, knowing that a written instrument contains a false statement or false information, and with intent to defraud the state or any political subdivision thereof, he offers or presents it to a public office or public servant with the knowledge or belief that it will be filed with, registered or recorded in or otherwise become a part of the records of such public office or public servant.”
It is the contention of the People that the defendants, Mt. Hope and Petrosky, violated this section in that they presented three contaminated soil logs to the DEC in order to comply with the terms and conditions of the permit knowing that these reports were false in that they did not contain information regarding the intake of certain PCS from the State of New Jersey to the Mt. Hope facility.
In support of these allegations, the People contend that the principals of Mt. Hope, including Petrosky, were aware that the DEC, at least during the periods covered by the reports, had not and would not approve of the processing of any PCS except that which was generated within the State of New York.
It is, thus, the theory of the prosecution that it was out of fear that the Mt. Hope operation would be curtailed or shut down altogether by the DEC if reports were filed with the agency revealing that PCS originating from outside the State of New York (from New Jersey) had been processed there that the defendants, Mt. Hope and Petrosky, deliberately omitted any such information from the reports.
Each of the three contaminated soil logs offered into evidence bears a legend at the last entry reflecting total tonnage received, "N.Y. Grand Total”.
While it is true that the contaminated soil logs contain only references to New York State generated deliveries on their face, there has been no representation made that the logs cover anything but New York State jobs. In fact, the language utilized at the end of each log stating the totals is very specific in stating, "N.Y. Grand Totals”.
*521 The allegations of the indictment with respect to these counts plead that the defendants filed the reports "knowing that (each of) said report(s) was false”.
The record before the court does not reflect any showing that a single entry contained in any of the logs is false. The District Attorney simply contends that the omission of information concerning intake of material from outside the State of New York constitutes, "a false statement or false information”. (Penal Law § 175.35.)
Under these circumstances the alleged omission of information concerning materials received and processed from outside the State of New York cannot, as a matter of law, constitute a violation of either section 170.35 or 175.35 of the Penal Law relating to "a written instrument containing] a false statement or false information”, precisely because the soil log does not contain any false statement or false information. The soil logs contained information relating to "N.Y. totals” and this is plainly stated at the conclusion of each of them.
While it may even be so that these contaminated soil logs as proffered to the DEC were incomplete and inadequate for the purposes of compliance with the terms and conditions of the permit, this fact does not, of itself, render the documents to be false instruments as contemplated by the statutes.
As was stated in People v Bel Air Equip. Corp. (39 NY2d 48, 54 [1976]), the purpose of Penal Law § 175.35 is to, "guard against the possibility that officers of the State or its political subdivisions would act upon false or fraudulent 'instruments’ * * * filed with their offices”.
Here, the DEC was presented with three contaminated soil logs reflecting New York State totals. It has not ever been alleged, much less proven beyond a reasonable doubt, that there was any false or even erroneous information contained in the contaminated soil logs submitted as presented to the DEC.
While it may be that there was never an agency decision on the part of the DEC to permit the processing of PCS originating outside the State of New York at the Mt. Hope facility, even if this were specifically prohibited, a failure to list the non-New York State PCS on the contaminated soil logs, so long as no claim was made that the logs represented a complete accounting of all incoming soil, no violation of Penal Law § 175.35 or 175.30 relating to the filing of false instruments may be sustained. .
*522 In fact, the logs here in question go one step further than making no representation at all on the topic; each of them affirmatively states that the logs represent "New York Totals”. Any reasonable and literate examiner of the documents could not have been deceived in view of this specific, obvious, even glaring, limitation.
In the event that those persons in charge of administering this permit for the DEC were of a mind that the contaminated soil logs as presented were inadequate or incomplete, there was a readily available remedy which is often employed by the DEC and other administrative agencies. The agency could have simply rejected the logs as not in compliance with the requirements of the permit and required the permittee to file new and amended logs containing any missing information which the agency may have found wanting or lacking.
While the soil logs, as presented, may not have been adequate or complete in terms of the DEC permitting process this does not, ipso facto, render them false.
The question of the adequacy of these soil logs for permitting purposes is a matter for administrative determination by the DEC and not for a Criminal Court.
THE ALLEGED ENVIRONMENTAL CONSERVATION LAW VIOLATION
This count originates in the discovery by investigators and technicians, either attached to or working under the auspices of the Suffolk County District Attorney’s Office, of certain items of physical evidence at the Mt. Hope facility in Calverton, New York, while executing a search warrant on September 16, 1993 and which is alleged to constitute a criminal violation of the ECL.
This count charges, in essence, that the defendants, Mt. Hope and Petrosky, "caused the dumping and grading of more than 15,000 pounds of soil and solid waste containing zinc, lead, chromium, acetone, 1,3,5 trimethylbenzene, 1,2,4 trimethylbenzene, ethylbenzene and petroleum and paved it over into a parking lot.”
The District Attorney contends that a large, graded parking lot was created at the Mt. Hope facility by the defendants, Petrosky and Mt. Hope, and that a major portion of the material contained within it was PCS which had been brought to the Mt. Hope facility from a job site in Oyster Bay, New York, known as the Jacobson Shipyard.
The District Attorney urges that the managers of the Mt. Hope facility were unable to process the material arriving *523 from the Jacobson Shipyard and elsewhere to keep pace with the incoming flow of PCS.
Accordingly, it is theorized that much material, especially from the Jacobson job, was simply placed in a mound and paved over into a parking lot.
The court did, in the company of respective counsel, inspect the parking lot. There is no question that the parking lot is sizeable, ranging from six to nine feet above grade and encompassing a substantial area.
The People have adduced testimony to the effect that large amounts of soil were transported from the Jacobson Shipyard to the Mt. Hope facility.
Moreover, it would appear that certain of the samples analyzed by the Suffolk County Health Department, as a result of the excavation of the parking lot during the execution of the search warrant of September 16, 1993, were in many ways consistent with the material present at the Jacobson Shipyard site.
Also, the District Attorney has adduced credible proof through various witnesses who were present in the field and also through laboratory analysis that certain contaminants were present at three-, six- and nine-foot depths, which in some cases not only indicated the presence of PCS, but also were to one degree or another consistent with samples of material obtained from the Jacobson Shipyard.
As to the actual construction of the parking lot, one Joseph Pedone was called as a defense witness and testified that he was a heavy equipment operator employed at the Mt. Hope facility in the late spring of 1992. The court finds his testimony to have been credible.
He testified that the area where the parking lot existed at the time of the execution of the search warrant consisted of mountains and valleys of heaved up and discarded materials.
There were loam and old, rejected asphalt chunks, cold patch, concrete chunks, sand, stone, AC Mix and materials containing fuel oil in the area.
Pedone testified that he used a payloader to knock down the high points and fill in the valleys. He described the area before he began his work as containing "moon craters”.
He stated that he finished his work on April 25, 1992 by filling any remaining holes or gaps with virgin bank run.
Although a substantial amount of material was removed from the Jacobson site and brought to Mt. Hope, there is no *524 proof in this record as to how much of the soil removed was PCS or otherwise contaminated. While it may be true that the shipyard or related entities were billed for trucking and tip-page on the basis that all of the soil was PCS, it does not necessarily follow that all of the soil was, in fact, PCS.
Insofar as the record of these proceedings is concerned, there has been no showing of what contaminants, PCS, or otherwise, were present at the site of the parking lot or its environs prior to the alleged dumping which is the subject of this indictment.
The record is clear that the area in the vicinity of the parking lot was a kind of dumping ground for all manner of construction material as well as asphalt and concrete, related by-products and other contaminated material, for more than two decades prior to the issuance of the DEC permit on August 7, 1991.
Had the DEC required the submission of a proper environmental survey of the asphalt plant and the immediate surrounding area prior to the issuance of the permit on August 7, 1991 there probably would not now be a factual dispute as to what contaminants already were existing in the area and as to whether or not any contaminants had been released there by the defendants.
On this record it is not possible to determine, even assuming that material from the Jacobson Shipyard or some other job site is established to be contained in the parking lot, that the particular material so contained is PCS originating from an outside source which the defendants actually released or discharged into the environment.
The proof now before the court, under such circumstances as these, is not susceptible to objective analysis because of a lack of a beginning point in two critical areas.
It probably can never be known, surely it has not been shown here, how much of what kinds of contaminants existed at the Mt. Hope site prior to the time period covered by this indictment.
All that is known for certain is that, to one degree or another, the area had been subjected to petroleum product and other contamination degradation for at least two decades prior to the time in question.
Secondly, there is no proof in this record, even if one were to assume that material from the Jacobson Shipyard were present in the parking lot, that the particular material was PCS or otherwise contaminated.
*525 There exists yet another, separate, but related, difficulty with this prosecution.
Unlike, for example, the larceny statutes in the Penal Law, which provide a penalty for any taking of property, the ECL does not provide, under the circumstances here present, that an offense has taken place unless there is released to the environment at least "more than five gallons or fifty pounds, whichever is less, of an aggregate weight or volume of a substance hazardous to public health, safety or the environment”. (ECL 71-2710.)
On this record, because of the lack of any reference point either to the preexisting condition of the site or the specific composition and character of the materials allegedly dumped there, even if it were found that the defendants had occasioned an unlawful discharge, it is not possible to quantify the same so as to fulfill the requirement of even a lesser included offense than that here charged, pursuant to the ECL.
In short, this prosecution must fail because the regulators of this project utterly failed initially to provide a known starting point useful for any enforcement purposes, at least in terms of policing and preventing any further actual or potential environmental degradation of the site.
Accordingly, both defendants, Mount Hope Asphalt Corporation and Frank Petrosky, are acquitted after trial as to all counts.